Yelena BIRD; Freedom Cheteni; John Moraros; Satya Rao, Plaintiffs–Appellants,

and

Robert Buckingham, Plaintiff,

v.

REGENTS OF NEW MEXICO STATE UNIVERSITY; Larry Olsen, in his individual capacity; James Robinson, in his individual capacity; Robert Gallagher, in his individual capacity; Michael Zimmerman, in his individual capacity, Defendants–Appellees,

and

Michael Martin, in his individual capacity, Defendant.

No. 14–2040.

United States Court of Appeals, Tenth Circuit.

Aug. 6, 2015.

Alice Kilborn, Christopher Murray Moody, Whitney Warner, Moody & Warner, P.C., Albuquerque, NM, for Plaintiffs–Appellants.

Bruce R. Kite, New Mexico State University Office of the General Counsel, Cody R. Rogers, Joshua Lawrence Smith, Lawrence R. White, Miller Stratvert, Las Cruces, NM, Luke Salganek, Miller Stratvert, Santa Fe, NM, for Defendants–Appellees.

Before KELLY, PORFILIO, and MATHESON, Circuit Judges.

Judge KELLY concurs in the judgment.

## ORDER AND JUDGMENT*

SCOTT M. MATHESON, JR., Circuit Judge.

Plaintiffs sued the Regents of New Mexico State University (NMSU) and five NMSU officials. In their fourth amended complaint, they alleged defendants discriminated against them based on their race, retaliated against them for making discrimination claims, and retaliated against them for publicly expressing complaints about discrimination and retaliation at NMSU, in violation of 42 U.S.C. §§ 1981 and 1983; § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17; and the New Mexico Human Rights Act (NMHRA), N.M. Stat. Ann. §§ 28–1–1 to 28–1–14.[1]

Over a three-year period, defendants filed numerous motions for summary judgment or partial summary judgment on plaintiffs' claims; and plaintiffs Bird, Moraros, and Cheteni moved for partial summary judgment on their claims. The district court denied plaintiffs' motions and granted summary judgment to defendants on all of the plaintiffs' federal claims and some of their state-law claims under the NMHRA. As a result, the district court declined to exercise supplemental jurisdiction over Dr. Bird's and Dr. Moraros's last two remaining NMHRA claims and entered judgment for defendants.

Plaintiffs appeal from 14 orders. Each ruled against them and in favor of defendants.[2] Plaintiffs advance no arguments as to eight of the orders. We therefore do not review them. As to the other six orders, their briefing suffers pervasive de-

* After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

1. Plaintiff Robert Buckingham settled his claims against defendants in September 2010 and is not a party to this appeal.

2. Defendant Michael Martin, who was President of NMSU, is not a party to this appeal. Plaintiffs did not appeal from the district court's March 6, 2012 order granting summary judgment based on qualified immunity to Dr. Martin, and did not include him in any of their arguments. See Aplt.App. Vol. VIII at 2715–16 (notice of appeal), Doc. 425 (summary judgment order, not included in appellants' appendix).

ficiencies, including failure to acknowledge or challenge the court's reasons supporting its conclusions that their claims lack sufficient evidentiary basis. These deficiencies foreclose us from considering and in some instances even ascertaining what might otherwise have been some meritorious arguments. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND[3]

The defendants are the Regents of NMSU;[4] Robert Gallagher, who was President of NMSU's Board of Regents; Michael Zimmerman, who was Registrar; Larry Olsen, who was a professor of health science, the Associate Dean for Academics and Research in the College of Health and Social Services, and, during the Fall 2007 semester, the interim Dean of the College of Health and Social Services; and James Robinson, who was Chairman of the Department of Health Sciences.

Plaintiffs John Moraros, a Hispanic, and Yelena Bird, an African American, are husband and wife. They entered NMSU in 2002 as graduate students after completing medical degrees in Mexico. Both obtained two degrees from NMSU: master's degrees in public health in 2004 and Ph.D. degrees in molecular biology in 2007. NMSU employed both of them as nontenure-track faculty members during their Ph.D. programs. In late 2006 or early 2007, they complained about discrimination at NMSU. They spent much of 2007 in Seattle doing research. Upon returning to Las Cruces, both submitted vouchers for their travel expenses, which resulted in an internal audit concerning duplicate requests each of them made for reimbursement. The auditor interviewed them.

The February 2008 audit report concluded they may have attempted to defraud the University, not that they merely submitted duplicate requests by mistake. The Provost did not renew their teaching contracts. NMSU informed Dr. Bird and Dr. Moraros in February 2008 their employment would terminate in May 2008.

In the spring of 2008, Dr. Bird and Dr. Moraros both gave press interviews, complaining about discrimination and retaliation at NMSU. Mr. Gallagher responded. Although Dr. Bird and Dr. Moraros subsequently applied for and were granted admission as students to NMSU's School of Social Work in June 2008, their admissions were later rescinded. They claimed defendants threatened to revoke their NMSU degrees.

Plaintiff Freedom Cheteni, a black male from Zimbabwe, entered the United States in 2002 on an F–1 student visa and applied to immigration officials for political asylum in 2006. He entered NMSU in 2007 as a graduate student to work on a master's degree in public health. He worked for Dr. Moraros as a graduate assistant during the 2007–2008 school year. Beginning in February 2008, Mr. Cheteni complained about, and filed charges of, discrimination and retaliation at NMSU, both with NMSU and the Equal Employment Opportunity Commission (EEOC). In the spring of 2008, Mr. Cheteni also spoke with journalists, complaining of discrimination and retaliation at NMSU. Mr. Gallagher responded about Mr. Cheteni's complaints.

In March 2008, Mr. Cheteni applied for admission to the Ph.D. program in economics in the College of Business. In the summer of 2008, his graduate assistantship in the Department of Health Sciences was

---

3. The facts in this background section are not disputed.

4. For simplicity, we refer to the Regents of New Mexico State University as "NMSU" throughout this decision.

not renewed for the 2008–2009 school year. Although he had been charged in-state tuition for the 20072008 school year based on his pending asylum application, he was charged out-of-state tuition for the Fall 2008 semester. He paid the in-state portion of his tuition for that semester, but he was not allowed to enroll for the Spring 2009 semester until he paid the balance of out-of-state tuition. Due to the loss of his graduate assistantship, however, he could not afford to enroll for the Spring 2009 semester, and NMSU reported to immigration officials that he was not enrolled. His failure to enroll in school put him out of student status for immigration purposes by March 2009. He was arrested by immigration officials on April 15, 2009, and was detained for approximately five months.

Plaintiff Satya Rao, from India, was hired as an assistant professor in NMSU's Department of Health Sciences in 1996, promoted to associate professor in 2001, and granted tenure in 2002. She inquired into applying for a promotion to full professor in 2007, but did not due to Dr. Robinson's expressed lack of support. In January 2008, Dr. Rao began complaining about discrimination at NMSU. She filed an EEOC charge of discrimination in March 2008. She also spoke to journalists about her concerns. She applied for a promotion to full professor in 2009, but her application was denied.

## II. ISSUES ON APPEAL

Plaintiffs assert seven general issues in their opening brief. Aplt. Opening Br. at 2–3. But their statement of the issues does not specify how the plaintiffs think the district court erred. *See id.* We attempt to glean this information from the argument section of their opening brief.

Dr. Bird and Dr. Moraros assert four of the general issues. First, they argue their claims of race discrimination and retalia-tion against NMSU should be tried because they presented sufficient evidence that NMSU's proffered reasons for (a) the nonrenewal of their teaching contracts, (b) the rescission of their admission to NMSU's School of Social Work following their nonrenewal, and (c) the threats to revoke their NMSU degrees following their nonrenewal were a pretext for discrimination. Second, they argue their claims of race discrimination and retaliation against Dr. Robinson and Dr. Olsen should be tried because they presented sufficient evidence that Dr. Robinson's and Dr. Olsen's actions against them were discriminatory and retaliatory. Third, they argue their claims of race discrimination and retaliation against NMSU should be tried under the "cat's paw" doctrine found in *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), because Dr. Robinson and Dr. Olsen harbored racial and retaliatory animus toward them and proximately caused their nonrenewal. Fourth, Dr. Bird and Dr. Moraros argue their claims of First Amendment retaliation against Mr. Gallagher should be tried because there was sufficient evidence that he spread negative information about them because of their speech on matters of public concern.

Mr. Cheteni asserts two general issues on appeal. First, he argues his claim of race discrimination and retaliation against NMSU should be tried because (a) the district court applied the wrong legal standard to his claims and because there was sufficient evidence that the proffered reasons for (b) failing to renew his graduate assistantship, (c) refusing to continue giving him in-state tuition, and (d) reporting him to immigration officials as unenrolled were pretextual. Second, he argues his claims of race discrimination and retaliation against Mr. Zimmerman should be tried because there was sufficient evidence

that (a) Mr. Zimmerman's reason for denying him in-state tuition was a pretext for discrimination and retaliation, and (b) Mr. Zimmerman's actions were not objectively reasonable, so he was not entitled to qualified immunity.

Dr. Rao raises the remaining issue, arguing generally that NMSU is liable for discrimination and retaliation for failing to promote her to full professor in 2007 or 2009.

We have spent considerable time examining the district court's orders and the argument section of plaintiffs' opening brief, searching for arguments and references to record evidence that address the district court's analysis and reasoning. As explained below, plaintiffs do not adequately acknowledge, address, or challenge with record evidence the district court's reasons for ruling against them. Plaintiffs have not shown error in the district court's reasoning and conclusions, and we therefore affirm.

## III. STANDARDS OF REVIEW

### A. *Summary Judgment Review*

"We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir.2011). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(a)). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir. 1980).

We have previously explained, however, that "although our review [in a summary judgment case] is de novo, we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). This standard is particularly important in employment discrimination cases "[b]ecause of the sheer volume of the record." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008) (citing *Adler*, 144 F.3d at 672). The district court may "go beyond the referenced portions" of the plaintiffs' evidentiary materials, "but is not required to do so." *Adler*, 144 F.3d at 672. This court also may "more broadly review the record on appeal," but we ordinarily do not do so because "we, like the district courts, have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it." *Id.; cf. SIL–FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir.1990) (holding that the court of appeals "need not 'sift through' the record to find [the appellant's] evidence" in the absence of citations in the appellant's brief).[5]

---

5. Dr. Bird and Dr. Moraros appeal from the district court's order granting summary judgment to Mr. Gallagher on their First Amendment retaliation claims against him. The court granted him qualified immunity because plaintiffs failed to produce specific evidence that he acted with a retaliatory motive, as required by *McBeth v. Himes*, 598 F.3d 708, 724–25 (10th Cir.2010). On appeal, Dr. Bird and Dr. Moraros do not adequately present evidence supporting this claim. *See* Aplt. Opening Br. at 3, 46–47.

We have said that "[i]n cases involving the First Amendment, the de novo standard is

## B. *Legal Background*

We briefly review pertinent legal background here to put the ensuing discussion in context.

### 1. The *McDonnell Douglas* Burden–Shifting Framework for Discrimination and Related Retaliation Claims

At the district court, plaintiffs attempted to use indirect or circumstantial evidence to show discrimination and retaliation. Accordingly, their claims are assessed under the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> First a plaintiff must establish a prima facie case of ... discrimination. If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant does so, the burden shifts back to the plaintiff to show that his or her protected characteristic was a determinative factor in the defendant's employment decision or that the defendant's explanation was merely pretextual.

*Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir.2015) (discussing pay discrimination claim under Title VII) (internal quotation marks omitted).

"[I]n racial discrimination suits, the elements of a plaintiff's [prima facie] case are the same ... whether that case is brought under [42 U.S.C.] §§ 1981 or 1983 or Title VII." *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir.2005) (first and third alterations in original) (internal quotation marks omitted). In a case alleging employment discrimination, the same standard is used for Title VII and NMHRA claims. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 n. 5 (10th Cir.2005). And "[c]ourts often use [the] Title VII proof scheme for Title VI claims." *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 930 n. 1 (10th Cir.2003).

"[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir.2005). Generally, to make out a prima facie case of discrimination, a plaintiff must demonstrate "that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir.2007). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.' " *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir.2000) (quoting *Texas Dep't of*

appropriate [at summary judgment] ... for the further reason that ... 'an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1270 (10th Cir.1998) (quoting *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)) (further quotation omitted).

This First Amendment standard of review does not excuse plaintiffs from adequately de-veloping an appellate argument that presents the necessary supporting evidence. As we have said in a case alleging retaliation for protected speech, "[i]t is the place of counsel, not the Court of Appeals, to identify the specific instances of speech upon which the plaintiff seeks to base [his or] her claim." *Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1226 (10th Cir.2001). The appellant "bears the burden of demonstrating the alleged error." *Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir.1995).

*Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The prima facie case for a retaliation claim based on an underlying claim of discrimination differs from that for the race discrimination claim itself:

> Under the *McDonnell Douglas* approach, a plaintiff must first make out a prima facie case of retaliation by showing (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.

*Estate of Bassatt v. Sch. Dist. No. 1,* 775 F.3d 1233, 1238 (10th Cir.2014) (discussing retaliation claim under Title VII) (internal quotation marks omitted); *see also Twigg,* 659 F.3d at 998 (discussing retaliation claim under 42 U.S.C. § 1981).

When a plaintiff asserts that an unbiased decisionmaker took an adverse action based on the recommendation of a biased subordinate (known as "cat's paw" liability), the plaintiff must establish as part of the prima facie case "the decisionmaker's uncritical 'reli[ance]' on facts provided by a biased supervisor." *Lobato v. N.M. Envtl. Dep't,* 733 F.3d 1283, 1294 (10th Cir.2013) (alteration in original) (quoting *Staub,* 562 U.S. at 421, 131 S.Ct. 1186).

As shown above, the elements of a prima facie case differ between race discrimination and retaliation claims. The *McDonnell Douglas* burden-shifting analysis, however, is the same for retaliation claims related to race discrimination: (1) "a plaintiff must first make out a prima facie case of retaliation"; (2) "[o]nce the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legiti-

mate and facially nondiscriminatory reason for its decision"; and (3) "[i]f the employer satisfies this burden, then the plaintiff must establish by a preponderance of the evidence that the employer's reasons were merely a pretext for discrimination." *Estate of Bassatt,* 775 F.3d at 1238.

As to both their discrimination and retaliation claims, plaintiffs focus most of their appellate arguments on the pretext step of this analysis. "A plaintiff demonstrates pretext by producing evidence of such weaknesses ... in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 1239 (alteration in original) (internal quotation marks omitted).

## 2. The *Garcetti/Pickering*[6] Analysis for First Amendment Retaliation Claims

Plaintiffs alleged two types of retaliation claims. The one described above is a claim that the defendant took adverse action against the plaintiff for making a claim of discrimination. The second type, described here, concerns retaliation for the exercise of free speech on a matter of public concern protected by the First Amendment.

The Supreme Court has "declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks,* —— U.S. ——, 134 S.Ct. 2369, 2374, 189 L.Ed.2d 312 (2014). But public employees do "not enjoy the same scope of First Amendment rights as a private citizen." *Rock v. Levinski,* No. 14–2157, 791 F.3d 1215, 1218–19 (10th Cir.2015). " '[T]he First Amendment protection of a public employee's speech depends on a careful balance between the

---

**6.** *See Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Pickering*

*v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Seifert v. Unified Gov't of Wyandotte Cty./Kan.City*, 779 F.3d 1141, 1151 (10th Cir.2015) (alteration in original) (quoting *Lane*, 134 S.Ct. at 2374).

"The familiar *Garcetti/Pickering* analysis governs First Amendment retaliation claims." *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1367 (10th Cir.2015) (internal quotation marks omitted). It consists of five elements:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (internal quotation marks omitted). "The first three elements are typically questions of law (though they can turn on disputed issues of fact), while the last two are typically questions of fact." *Seifert*, 779 F.3d at 1151.

## 3. Qualified Immunity for Individuals Sued Under 42 U.S.C. §§ 1981 and 1983

"Suits against government officials in their individual capacities are governed by 42 U.S.C. § 1983, which imposes civil liability on a person who acting under the color of the law causes a deprivation of another's constitutional right." *McDonald v. Wise*, 769 F.3d 1202, 1215 (10th Cir.

2014). "The qualified immunity doctrine shields government officials from individual liability 'for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 758 (10th Cir.2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)) (assessing § 1983 claim). The doctrine of qualified immunity "affords 'protection to all but the plainly incompetent or those who knowingly violate the law.'" *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1183 (10th Cir.2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). We have applied qualified immunity analysis to § 1981 claims as well as to § 1983 claims, *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1244 (10th Cir.2000), to shield from suit public officials who have been sued in their individual capacities for money damages, regardless of whether the underlying claim itself is assessed under *McDonnell Douglas* or *Garcetti/Pickering*.

"Generally, when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir.2014) (internal quotation marks omitted) (discussing claim under § 1983). When the defense of qualified immunity has been asserted, "[p]laintiff has the burden to show with particularity facts and law establishing the inference that defendant violated a constitutional right." *Hollingsworth v. Hill*, 110 F.3d 733, 737–38 (10th Cir.1997) (internal quotation marks omitted).

Once a plaintiff carries his initial burden, "[t]he burden then shifts to the defendant to show that there are no material issues of fact that would defeat the claim of qualified immunity." *Felders ex rel. Smedley v. Malcom,* 755 F.3d 870, 877 (10th Cir.2014). The defendant must "show that there are no disputes of material fact as to whether his conduct was objectively reasonable in light of clearly established law and the information known to the defendant at the time." *Id.* (internal quotation marks omitted).

#### 4. Modified Qualified Immunity Analysis When Motive Is at Issue

"When the qualified immunity inquiry turns on a subjective element, as it does when examining motive, the qualified immunity analysis is modified slightly." *McBeth v. Himes,* 598 F.3d 708, 724 (10th Cir.2010) (internal quotation marks omitted) (applying modified qualified immunity test to First Amendment retaliation claim where motive was at issue); *see also Bruning v. Pixler,* 949 F.2d 352, 356 (10th Cir.1991) (explaining, in case challenging affidavits supporting a search warrant, that the modified qualified immunity test applies "when the plaintiff's claim contains a subjective element, such as the defendant's purpose, motive, or intent"). In this context, "[t]he defendant must do more than merely raise the qualified immunity defense; he must make a prima facie showing of the objective reasonableness of the challenged conduct." *McBeth,* 598 F.3d at 724 (brackets omitted) (internal quotation marks omitted). If the defendant carries this burden, "the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment." *Id.* at 724–25 (internal quotation marks omitted).

#### 5. Appellate Briefing Standards

"The first task of an appellant is to explain to us why the district court's deci-

sion was wrong." *Nixon,* 784 F.3d at 1366; *accord Hernandez v. Starbuck,* 69 F.3d 1089, 1093 (10th Cir.1995) ("Because the appellant comes to the court of appeals as the challenger, he bears the burden of demonstrating the alleged error and the precise relief sought."). Advancing other arguments "will not help the appellant if the reasons that were given by the district court go unchallenged." *Nixon,* 784 F.3d at 1366. We are "not required to manufacture an appellant's argument on appeal when it has failed in its burden to draw our attention to the error below." *Hernandez,* 69 F.3d at 1093 (internal quotation marks omitted). An appellant must "explain what was wrong with the reasoning that the district court relied on in reaching its decision." *Nixon,* 784 F.3d at 1366.

Rule 28(a)(8)(A) of the Federal Rules of Appellate Procedure "requires the argument section [of an appellant's brief] to contain 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'" *MacArthur v. San Juan Cty.,* 495 F.3d 1157, 1160 (10th Cir.2007) (quoting Rule 28(a)(9)(A), as the rule was styled before the 2013 amendments reorganized the paragraphs). "Under Rule 28, ... a brief must contain ... more than a generalized assertion of error, with citations to supporting authority." *Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 841 (10th Cir.2005) (second alteration in original) (internal quotation marks omitted).

When "[t]he argument section of [the] opening brief does not challenge the [district] court's reasoning on [a] point[, w]e ... do not address the matter." *Reedy v. Werholtz,* 660 F.3d 1270, 1275 (10th Cir. 2011). It is a "settled principle that when an *appellant* fails to raise a contention in

his opening brief the ground for relief is ordinarily considered waived." *Hernandez*, 69 F.3d at 1093. And we generally "do not review claims on appeal that were not presented below." *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1217 (10th Cir.2008). Accordingly, our local rules require appellants to identify "the precise reference in the record where [each] issue was raised and ruled on." 10th Cir. R. 28.2(C)(2).

## IV. OUTLINE OF APPELLANTS' ARGUMENTS

As noted above, plaintiffs assert only seven issues for appeal in their statement of the issues. Aplt. Opening Br. at 2–3. Nonetheless, we have counted attempts to make 21 distinct arguments in the 28–page argument section of their opening brief. *See id.* at 33–62. For the benefit of the reader, we provide the following outline. We list Mr. Cheteni's issues in a different order than presented in plaintiffs' brief to facilitate our analysis.

### A. *Dr. Bird and Dr. Moraros*

NMSU's Reasons for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts Were Pretextual Because:

1. NMSU Departed From an Established Past Practice in Investigating Their Duplicate Expense Vouchers;

2. Dr. Robinson's Pre–Recommendation Meeting With Senior Faculty Members Was Pro Forma;

3. The Audit Report Did Not Find Fraud;

4. The Non–Minority Comparator Was Not Terminated After a Finding of Fraud; and

5. Dr. Robinson and Dr. Olsen Made Racist Remarks Against Dr. Bird and Dr. Moraros.

NMSU's Reasons for Rescinding Dr. Bird's and Dr. Moraros's Admissions to the School of Social Work Post–Nonrenewal Were Pretextual Because:

6. They Were Singled Out for an Audit of Their Credentials; and

7. They Had Already Provided Information to Support Admission.

8. NMSU's Reasons for Threatening to Revoke Dr. Bird's and Dr. Moraros's NMSU Graduate Degrees Were Pretextual;

9. Dr. Robinson and Dr. Olsen Were Directly Involved In and Are Liable for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts;

10. Dr. Robinson and Dr. Olsen Were Biased Against Dr. Bird and Dr. Moraros;

11. Dr. Robinson and Dr. Olsen Proximately Caused Dr. Bird's and Dr. Moraros's Nonrenewal, so NMSU Is Liable; and

12. Mr. Gallagher Is Liable for Retaliation Against Dr. Bird and Dr. Moraros Based on His Speech to the Press.

### B. *Mr. Cheteni*

13. Mr. Zimmerman's Actions Were Not Objectively Reasonable, so He Is Not Entitled to Qualified Immunity on Mr. Cheteni's Retaliation Claims;

14. NMSU's Reasons for Revoking Mr. Cheteni's In–State Tuition Were Pretextual Because He Sufficiently Demonstrated to Mr. Zimmerman His Asylum Application Was Still Pending;

15. NMSU Is Liable for Retaliation Because Mr. Zimmerman's Reasons for Reporting Mr. Cheteni's Loss of Student Status to Immigration Of-

ficials Violated a Prior Court Order;

16. NMSU's Reasons for Nonrenewal of Mr. Cheteni's Graduate Assistantship Were Pretextual Because Dr. Arnold Knew That He Was Enrolled in the Department of Health Sciences; and

17. Mr. Cheteni's Claims Against NMSU under Title VI, Title VII, and NMHRA Should Be Tried Because the District Court Applied the Wrong Legal Standard.

### C. *Dr. Rao*

Dr. Rao Made a Prima Facie Showing of:

18. NMSU's Discrimination in 2007;

19. NMSU's Discrimination in 2009; and

20. NMSU's Retaliation in 2009.

21. Dr. Rao Showed Pretext in her 2009 Retaliation Claim Against NMSU.

### V. DISCUSSION OF APPELLANTS' ARGUMENTS

Before we discuss each of plaintiffs' issues, we identify these overarching problems with their briefing.

First, some of plaintiffs' 21 specific arguments are as short as a single paragraph; the longest is only two and a half pages. Within these arguments, plaintiffs have only interspersed references to particular conclusions the district court made, mostly followed by a cite to one or more of the district court orders. Contrary to 10th Cir. R. 28.2(C)(2), however, plaintiffs do not identify where their issues were raised in the district court. Moreover, some of their arguments were not raised below.

Second, plaintiffs' factual assertions are also problematic. They ignore defendants' evidence and present only a selected portion of their own evidence, as compared to what they presented to the district court and what the district court addressed in its orders. Beyond that, many of their factual assertions lack any record cite, while others either are unsupported by the cite provided or are contradicted by the cited evidence.[7]

Third, even if plaintiffs had properly supported every factual assertion in their brief with a valid record cite, they would not overcome their failure (1) to adequately challenge the grounds supporting the district court's conclusions that summary judgment was properly granted to defendants or (2) to explain why the court's application of the law or assessment of the evidence was wrong. Plaintiffs largely avoid the district court's reasoning rather than address it. A footnote in their reply brief illustrates their misunderstanding of their obligations on appeal:

> Appellees appear to be concerned that Appellants did not review each and every point of each ruling upon which they believe the District Court has erred.

---

**7.** The district court also noted similar deficiencies in plaintiffs' briefs. *See, e.g.,* Aplt. App. Vol. V at 1549 n. 2 (noting plaintiffs' incorrect references to their exhibits); *id.* at 1560 (noting in Doc. 426 that Dr. Bird and Dr. Moraros's argument that Dr. Robinson had made racist comments about them was limited to two sentences followed by a cite to four of their Additional Material Facts); *id.* at 1586 (noting in Doc. 437 that Mr. Cheteni had failed to produce evidence of Mr. Zimmer- man's culpable state of mind and stating the court would "not comb the record" to look for the evidence or manufacture an explanation that Mr. Cheteni had failed to provide for why Mr. Zimmerman's actions were improperly motivated); *id.* Vol. VII at 2457 (noting in Doc. 484 that Dr. Rao had produced evidence only of the guidelines governing her application for promotion to full professor and no evidence of the policies governing the prior promotions of other faculty members).

[Aplee. Br. at] 42. Appellants point out that such recitation is unnecessary as the standard of review on appeal is *de novo* and all fourteen (14) Memorandum Opinion and Orders have been provided to the court both within the Appendix and as an attachment to Appellants['] Opening Brief.

Aplt. Reply Br. at 13 n. 1.

Plaintiffs' approach to this appeal is akin to emptying a box of jigsaw puzzle pieces onto a table and asking this court to put the picture of their arguments together. But that is their job, and they have not shown how the district court erred in its reasoning in any of its 14 orders. Their arguments on appeal are misplaced, incomplete, factually unsupported, and unpersuasive; in short, their arguments are mostly inadequately briefed.

### A. *Dr. Bird and Dr. Moraros*

Dr. Bird and Dr. Moraros's arguments appear at pages 33–47 of the opening brief. They argue their claims for race discrimination and retaliation against NMSU, Dr. Robinson, Dr. Olsen, and Mr. Gallagher should be tried because they presented sufficient evidence that these defendants' proffered reasons for their actions were a pretext for discrimination and retaliation at the third step of the *McDonnell Douglas* burden-shifting scheme.

1. **NMSU's Reasons for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts Were Pretextual Because NMSU Departed From an Established Past Practice in Investigating Their Duplicate Expense Vouchers**

■ Dr. Bird and Dr. Moraros argue, in one long paragraph, Aplt. Opening Br. at 35–36, that they showed pretext because Larry Olsen, then-faculty member and interim Dean of the College of Health and Social Services, and James Robinson, then-Chairman of the Department of Health Sciences, handled their duplicate vouchers for travel expenses (when they returned to Las Cruces from Seattle in 2007) contrary to an established, unwritten policy by referring the matter to internal audit instead of resolving the matter within the Department of Health Sciences. Though they state summarily that "[i]n all prior instances, issues were resolved amicably within the department by speaking with people involved and admonishing them to be more careful," *id.* at 35, they do not cite record evidence or provide detail about prior instances, *see id.* at 35–36.

Plaintiffs do not support their contention that the district court discounted their evidence. They state "the evidence cited above" shows error, *id.* at 35, but they do not provide record cites. This is insufficient to show pretext and also constitutes inadequate briefing under Fed. R.App. P. 28(a)(8)(A), which requires the argument section to contain the "citations to the authorities and parts of the record on which the appellant relies."

Plaintiffs refer to and do not challenge the district court's conclusion that "there was no policy *requiring* travel reimbursement issues be handled within the department," Aplt. Opening Br. at 36 (citing Aplt. App. Vol. V at 1556). They even concede that "no policy required that these issues be handled in any particular way." *Id.* All that is left to support their assertion of a deviation from an established practice is a string cite to eight pages in their appendix. *See id.* (citing Aplt.App. Vol. VII at 2272–73, 2305–10). One page is a letter from Dr. Olsen to Ms. Brenda Shannon, NMSU's chief auditor. Aplt.App. Vol. VII at 2310. The other seven pages are from Dr. Robinson's and Dr. Olsen's depositions. *Id.* at 2272–73 (Robinson), 2305–09 (Olsen). Plaintiffs do not explain, howev-

er, what we should find on these pages to support their argument.

We have reviewed plaintiffs' cited evidence. It does not support their argument that NMSU had an established, unwritten policy or practice for handling voucher problems within the Department of Health Sciences and that Dr. Robinson and Dr. Olsen deviated from that policy by referring Dr. Bird's and Dr. Moraros's duplicate requests to internal audit. Thus, Dr. Bird and Dr. Moraros's argument is conclusory, unsupported, and undeveloped. It is at best insufficiently supported and otherwise should be considered waived. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir. 2002) (holding that an argument consisting entirely of conclusory statements and unhelpful citations was deemed waived for failure to brief); *Moore v. Gibson*, 195 F.3d 1152, 1180 n. 17 (10th Cir.1999) ("We do not consider unsupported and undeveloped issues.").

Dr. Bird and Dr. Moraros's argument is further deficient because they do not mention, let alone challenge, the district court's summary of the law in its Memorandum Opinion and Order of March 23, 2012 ("Doc. 426") applicable to whether alleged procedural irregularities in written and unwritten policies show pretext, or the court's assessment of the evidence. *See* Aplt.App. Vol. V at 1555–56. Plaintiffs' argument that the court reached the wrong conclusion is therefore also inadequate or waived because they did not challenge the district court's reasoning. *See Reedy v. Werholtz*, 660 F.3d 1270, 1275 (10th Cir.2011) (holding that where "[t]he argument section of [appellant's] opening brief does not challenge the [district] court's reasoning on [a] point[, w]e . . . do not address the matter"); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 (10th Cir.1997)

(holding that appellants' failure to "explain[ ] how the district court erred" resulted in a waiver); *Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir.1995) (holding that the appellant "bears the burden of demonstrating the alleged error," and "when it has failed in its burden to draw our attention to the error below, . . ., the court will ordinarily consider the appellant's point waived" (internal quotation marks omitted)).

In any event, plaintiffs fail to show that the district court erred in rejecting their argument that NMSU was liable for discrimination and retaliation because Dr. Olsen and Dr. Robinson deviated from an established, unwritten policy or practice to handle voucher problems within the Department of Health Sciences.

**2. NMSU's Reasons for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts Were Pretextual Because Dr. Robinson's Pre–Recommendation Meeting With Senior Faculty Members Was Pro Forma**

■ Dr. Bird and Dr. Moraros's second argument challenging their nonrenewal is set out in two paragraphs. Aplt. Opening Br. at 36–37. They argue Dr. Robinson was required to consult with all senior faculty members about his proposed nonrenewal of Dr. Bird's and Dr. Moraros's teaching contracts, but he had already decided to recommend nonrenewal before holding a meeting, which was just "checking the box." *Id.* at 36 (internal quotation marks omitted). They do not contest that Dr. Robinson called a meeting, but they contend he did so on such short notice that Dr. Rao could not attend. *Id.* They assert the district court should not have rejected their argument that the policy required Dr. Robinson to consult senior faculty members in good faith. *Id.* at 36–37.

Dr. Bird and Dr. Moraros's argument includes no cites to the factual record, any district court order, or any case authority. They provide no factual basis for their assertion that Dr. Robinson had already made up his mind to recommend nonrenewal before holding the meeting with senior faculty members. *See id.* at 36. And they restate only part of the district court's finding—that Dr. Robinson was required to meet with senior faculty—neglecting to mention he was not required to agree with them. *Id.* at 37. *But cf.* Aplt. App. Vol. V at 1557. They do not cite the district court's order, Doc. 426, and they ignore that the district court also concluded that they had admitted, and the record showed, that Dr. Robinson had followed the policy to meet with senior faculty members. Aplt.App. Vol. V at 1557. They presented no evidence that Dr. Robinson was required to follow the consensus of the senior faculty members. *Id.*

Because plaintiffs fail to provide factual support for their assertions, their argument is insufficient to show pretext or is waived as unsupported and undeveloped under *Moore,* 195 F.3d at 1180 n. 17. And because they do not address or challenge the district court's reasons for rejecting their argument on this issue, they have not shown pretext or have otherwise waived their argument under *Reedy,* 660 F.3d at 1275; *Sports Racing Services,* 131 F.3d at 880; and *Hernandez,* 69 F.3d at 1093. It necessarily follows that plaintiffs have not shown the district court erred.

Finally, to the extent plaintiffs argue on appeal that Dr. Robinson was required to consult *"all"* senior faculty members, including Dr. Rao, Aplt. Opening Br. at 36, they do not show they raised this argument to the district court, *see id.,* and our review of their district court brief confirms that they did not do so, *see* Aplt.App. Vol. IV at 1234. "We do not review claims on appeal that were not presented below," *Pignanelli v. Pueblo Sch. Dist. No. 60,* 540 F.3d 1213, 1217 (10th Cir.2008), so plaintiffs' "all senior faculty" argument is waived.

### 3. NMSU's Reasons for the Nonrenewal of Dr. Bird and Dr. Moraros's Teaching Contracts Were Pretextual Because the Audit Report Did Not Find Fraud

■ Dr. Bird and Dr. Moraros's third challenge to their nonrenewal is set out in one long paragraph. Aplt. Opening Br. at 37–38. They argue that NMSU is liable because Provost Cruzado, who made the decision not to renew their teaching contracts, concluded they had attempted to defraud NMSU by submitting two expense vouchers for the same travel, but that the audit report did not explicitly find attempted fraud, so the Provost's stated reason for their nonrenewal is pretextual. *Id.* at 37. We reject their argument due to the deficiencies of their brief and their resulting failure to show pretext.

The audit report stated that only one of Dr. Bird's and Dr. Moraros's reimbursement requests was paid, "but the fact that both individuals requested reimbursement for the same mileage expense might constitute attempted fraud, assuming the two colluded to be paid twice for the same expense. The amount in question is approximately $800." Aplt.App. Vol. VII at 2311. The report also stated that "in accordance with state law and university policy," this " 'potential defalcation' " would be reported to "the State Auditor and the NMSU police." *Id.* at 2313. It found that Dr. Bird's explanation was "unclear" and Dr. Moraros's information was "contradictory," not that Dr. Bird and Dr. Moraros had simply made a mistake in submitting two vouchers for the same trip. *Id.* After the report was prepared, the Provost met

with the auditor, Ms. Shannon, to review it in detail. *Id.* at 2242.

The travel reimbursement issue was raised before the district court in Defendants NMSU and James Robinson's Revised Memorandum of Law in Support of Motion for Summary Judgment of April 15, 2011, Doc. 389, and Defendant Larry Olsen's Second Revised Motion for Summary Judgment on Plaintiffs' Claims for First Amendment Retaliation of October 7, 2011, Doc. 413. *See id.* Vol. IV at 1135 (Doc. 389), 1327 (Doc. 413). NMSU and Dr. Robinson alleged, with cites to the evidence, that Dr. Bird and Dr. Moraros had each submitted an expense voucher for the same travel after having been told they could submit only one request, and that they had submitted their requests through different departments at NMSU. *Id.* at 1138–1139, ¶¶ 14–20; 1145–1146. NMSU and Dr. Robinson further asserted that Dr. Bird and Dr. Moraros had acknowledged they had submitted two requests for the same trip, but contended that "it was mere 'negligence.'" *Id.* at 1146. NMSU and Dr. Robinson also asserted that the Provost had approved Dr. Robinson's recommendation for nonrenewal after reviewing the audit report with the auditor because the Provost was concerned about young faculty members attempting to defraud NMSU. *See id.* at 1138, ¶ 15; 1139, ¶ 20; 1146. Dr. Olsen asserted in his motion, also with cites to the evidence, that the NMSU Travel Office had questioned Dr. Bird's and Dr. Moraros's duplicate expense requests, that he had requested an audit at the direction of NMSU's general counsel, and that he had discussed his concerns about the travel reimbursement issue with Dr. Robinson and the Provost but was not involved in the decision not to renew Dr. Bird's and Dr. Moraros's teaching contracts. *Id.* at 1328, ¶ 3; 1329, ¶¶ 5–6.

Dr. Bird and Dr. Moraros attempted to dispute several of NMSU's and Dr. Robinson's alleged facts in their response in opposition, Doc. 401, to NMSU's and Dr. Robinson's summary judgment motion. *See id.* at 1217. They admitted that they each had submitted a travel expense request, *id.* at 1221–22, ¶¶ 22–23, but asserted the audit report did not find that they had attempted fraud "or that their conduct was anything other than an oversight," *id.* at 1224, ¶ 31; 1227, ¶ 52. They asserted that Provost Cruzado "was the alleged final decision-maker in the terminations of Bird and Moraros," *id.* at 1236, but that Dr. Robinson and Dr. Olsen, who were biased against them, were the driving forces in their nonrenewal, *see id.* at 1230–1238. Dr. Bird and Dr. Moraros made little attempt to dispute Dr. Olsen's allegations in their response in opposition, Doc. 418, alleging only that the Provost met with Dr. Robinson and Dr. Olsen "to discuss the continuation of Bird's and Moraros' faculty contracts, particularly due to the travel reimbursement issue." *Id.* at 1398, ¶ 18.

The district court granted, in relevant part, NMSU and Dr. Robinson's motion in Doc. 426. *See id.* Vol. V at 1545. It concluded that the travel reimbursement issue was the main reason for Dr. Bird's and Dr. Moraros's nonrenewal, *id.* at 1551, and that the audit report did not find their duplicate reimbursement requests were submitted by mistake, as they had contended, *id.* at 1552. The court also quoted the Provost's testimony concerning her reason for approving their nonrenewal:

It was mainly the concern that I had with two young faculty members who so early in their careers had attempted to defraud the institution.... The investigation about the attempt to defraud the institution, again, and the conclusions that were reached, provided me with the

necessary evidence to say this is not the type of faculty member that we can have at New Mexico State.

*Id.* at 1551–52 (citing *id.* Vol. IV at 1203 (Cruzado depo. 41:24–42:1)) (alteration in original). Subsequently, the district court also granted Dr. Olsen's motion in its Memorandum Opinion and Order of August 30, 2012 ("Doc. 431"). It concluded that plaintiffs did "not dispute Cruzado's conclusion that an attempt to defraud is sufficient cause not to renew contracts." *Id.* at 1576 (citing *id.* Vol. IV at 1201, 1203).

The district court concluded that the content of the audit report and the Provost's discussion with the auditor supplied the Provost a legitimate reason to terminate Dr. Bird's and Dr. Moraros's contracts. Dr. Bird and Dr. Moraros are not able to contest that conclusion, nor do they try. The only reference in their appellate brief to any district court order addressing the audit report is to one page in Doc. 431. *See* Aplt. Opening Br. at 38. They assert the district court determined that "the inconclusiveness of the report was not significant because the report did not find an absence of fraudulent intent." *Id.* at 37–38 (citing Aplt.App. Vol. V at 1576). They further assert the court misinterpreted "the significance of the report . . . because it does not support the stated reason for the terminations." *Id.* at 38. No such district court conclusion appears on the cited page, although the court indicated as much in Doc. 426. *See* Aplt.App. Vol. V at 1552. In any event, Dr. Bird and Dr. Moraros make only a conclusory reference to the audit report itself. *See* Aplt. Opening Br. at 37. They do not explain what was in the report, how the district court interpreted it, or why the report's alleged inconclusiveness is significant. *See* Aplt. Opening Br. at 37–38.

The district court addressed the audit report more fully in Doc. 426 on pages that plaintiffs do not cite anywhere in the argument section of their opening brief. *See* Aplt.App. Vol. V at 1551–54. As noted above, the court stated that the audit report did not find that Dr. Bird's and Dr. Moraros's duplicate reimbursement requests were submitted by mistake, as they had contended. *Id.* at 1552. In other words, the report did not exonerate them. Dr. Bird and Dr. Moraros do not challenge the court's conclusion.

Instead of discussing the district court's reasoning in their appellate brief, Dr. Bird and Dr. Moraros misstate or misconstrue factual matters without regard to what the district court said. They assert the Provost "allegedly" had "a brief meeting with the auditor," Aplt. Opening Br. at 37, but the evidence they cite shows the Provost met with Ms. Shannon and "went into almost item-by-item the things that—the methodology that [Ms. Shannon] observed, the persons or people that she had interviewed, how she gathered the information, including meetings with Dr. Moraros and Dr. Bird, and then her conclusions about— about the situation," Aplt.App. Vol. VII at ·2242 (Cruzado depo. 34:5–34:10). They assert—with evidentiary support—that Dr. Robinson "made his decision to terminate long before" the audit, Aplt. Opening Br. at 37, but they acknowledge that the Provost waited for the report and "approved the termination . . . because the audit found an attempt to defraud NMSU," *id.* Their conclusory allegation that Dr. Robinson did not wait for the audit to make up his mind to recommend nonrenewal does not show that the Provost's reliance upon the audit as the main reason to approve their nonrenewal was pretextual. Finally, they assert Dr. Olsen asked for the audit but do not explain how that was relevant to the Provost's decision not to renew Dr.

Bird's and Dr. Moraros's contracts. *See id.*

The Provost reviewed the report, met with the auditor, and determined the plaintiffs should be terminated from their teaching contracts for attempted fraud. Dr. Bird and Dr. Moraros's argument is insufficient to show pretext and is otherwise so undeveloped and lacking in explanation as to how the district court erred that it is waived under *Moore*, 195 F.3d at 1180 n. 17, and *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 (10th Cir.1997).

### 4. NMSU's Reasons for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts Were Pretextual Because the Non–Minority Comparator Was Not Terminated After a Finding of Fraud

■ Dr. Bird and Dr. Moraros's fourth argument challenging their nonrenewal is set out in two paragraphs. Aplt. Opening Br. at 38–39. They argue that Mary Hoke, a non-minority faculty member in the same college, *see id.* at 38, was found to have attempted fraud, but was not terminated. In the first paragraph of their argument, plaintiffs assert, "the District Court found, because Hoke's fraud concerned a grant, she was subject to different rules than Bird and Moraros." *Id.* at 38. They then cite to two pages of evidence, Aplt.App. Vol. VII at 2291, 2316, and two pages of the district court's order in Doc. 426, *id.* Vol. V at 1559–60, but say nothing more about the district court's two-page analysis.

Plaintiffs' argument suffers from two main problems. First, the court did not state that Ms. Hoke was subject to different rules because her fraud concerned a grant. *See* Aplt.App. Vol. V at 1559–60. Second, the court focused on plaintiffs' failure (1) to produce evidence of NMSU's disciplinary policy or (2) to produce evidence showing that they and Ms. Hoke should have been treated the same, even though their duplicate request was for approximately $800, whereas Ms. Hoke's attempted fraud involved a minimal amount. *See id.* at 1560. Plaintiffs do not address the court's reasoning. They cite *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540–42 (10th Cir.2014), but do not explain why, and their conclusory assertion that "Hoke was an appropriate comparator," Aplt. Opening Br. at 38, is both unexplained and unsupported by any cites to the law or the evidence, *see id.* at 38–39. Plaintiffs' argument is therefore insufficient to show pretext or waived as unsupported, *see Moore*, 195 F.3d at 1180 n. 17, and because they failed to challenge the district court's reasoning, *see Reedy v. Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011). In any event, plaintiffs have not shown the district court erred.

### 5. NMSU's Reasons for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts Were Pretextual Because Dr. Robinson and Dr. Olsen Made Racist Remarks Against Dr. Bird and Dr. Moraros

■ Dr. Bird and Dr. Moraros's fifth argument challenging the termination of their teaching contracts is set out in two and a half pages and has two parts, one relating to their discrimination claims and the other to their retaliation claims. Aplt. Opening Br. at 39–41. They argue that NMSU's reasons for their nonrenewal were a pretext for discrimination and retaliation because Dr. Robinson and Dr. Olsen made racist remarks. As with most of plaintiffs' arguments, their deficient appellant briefing forestalls this one.

First, Dr. Bird and Dr. Moraros argue Dr. Robinson and Dr. Olsen made racist remarks that show a pretext for discrimi-

nation because these defendants influenced the decision not to renew their teaching contracts. They contend Dr. Robinson recommended to the Provost that their contracts not be renewed, and Dr. Olsen started the process by requesting the internal audit of their duplicate vouchers that led to the Provost's decision to nonrenew. The statements attributed to these defendants and quoted in plaintiffs' brief are patently offensive. The issue here, however, is whether plaintiffs have shown the district court erred in failing to find pretext.

In their brief, Dr. Bird and Dr. Moraros cite only one district court order, Doc. 426, and it addressed their allegations only against Dr. Robinson, not Dr. Olsen. *See* Aplt.App. Vol. V at 1560–63. Plaintiffs do not specify where this issue was raised and ruled on in the district court as to Dr. Olsen, contrary to 10th Cir. R. 28.2(C)(2).[8] Because plaintiffs have not challenged on appeal a district court order that addressed Dr. Olsen's inappropriate remarks, under well-established standards of appellate review we do not consider this fifth argument against NMSU based on his remarks. Even if we did, plaintiffs have not shown that Dr. Olsen intended to influence or did influence the Provost's decision to terminate. *See Crowe v. ADT Sec. Servs., Inc.,* 649 F.3d 1189, 1194 (10th Cir.2011) (noting the Supreme Court's

holding that where a supervisor "performs an act motivated by discriminatory animus intending to cause an adverse employment decision, the employer will be liable if that act is a proximate cause of the eventual adverse employment decision") (citing *Staub v. Proctor Hospital,* 562 U.S. 411, 422, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011)).

In the district court, Dr. Bird and Dr. Moraros presented four comments made by Dr. Robinson. The district court addressed each of them in Doc. 426, explaining why the remarks either did not show discrimination or did not relate to plaintiffs' nonrenewal. *See* Aplt.App. Vol. V at 1561–63. Contrary to plaintiffs' unsupported assertion on appeal, the court did not simply reject the comments as "irrelevant 'stray remarks.'" Aplt. Opening Br. at 39.

On appeal, plaintiffs refer to only one exchange between Dr. Robinson and Dr. Bird. *Id.* at 41. Dr. Bird asserted he told her, "We need to bring in more of our kind into this—into this school," and when she asked what he meant, he said, "You're smart for a black girl. You can figure it out." Aplt.App. Vol. IV at 1274 (Bird depo. 67:15–67:22) (internal quotation marks omitted). The district court noted Dr. Bird had said Dr. Robinson made the remarks when he first met her but she had otherwise failed to specify when the comments were made. *Id.* Vol. V at 1562.

---

8. Plaintiffs cite evidence of his inappropriate remarks that they attached to their February 27, 2009 Response ("Doc. 52") to Defendant Larry Olsen's Motion for Summary Judgment on Qualified Immunity of January 8, 2009 ("Doc. 20"). *See* Aplt. Opening Br. at 40. The district court denied that motion in its Memorandum Opinion and Order of November 13, 2009 ("Doc. 109"). That order is not on appeal.

Dr. Bird and Dr. Moraros also cite evidence of Dr. Olsen's offensive remarks that they attached to their Response ("Doc. 475") to the Motion for Summary Judgment by Larry

Olsen, James Robinson, and the Regents of New Mexico State University on the Remaining Claims of Plaintiffs Bird and Moraros of February 22, 2013 ("Doc. 455"). *See* Aplt. Opening Br. at 40. The district court granted that motion in part in its Memorandum Opinion and Order Granting in Part Defendants' Motion for Summary Judgment on the Remaining Claims of Plaintiffs Bird and Moraros of July 3, 2013 ("Doc. 498"). Dr. Bird and Dr. Moraros do not, however, cite Doc. 498 in this fifth argument on appeal or assert any error in the district court's reasoning in that order. *See* Aplt. Opening Br. at 40.

The court concluded she had failed to provide enough information to show a nexus between Dr. Robinson's offensive comments and her nonrenewal. *Id.* (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir.1994)). Dr. Bird and Dr. Moraros do not mention or challenge the district court's reasons for concluding this evidence did not establish pretext as to their discrimination claim. *See* Aplt. Opening Br. at 41. As a result, their challenge on appeal to the district court's conclusion is insufficient or waived under *Reedy,* 660 F.3d at 1275; *Sports Racing Services,* 131 F.3d at 880; and *Hernandez v. Starbuck,* 69 F.3d 1089, 1093 (10th Cir. 1995).

In the second part of their fifth argument, Dr. Bird and Dr. Moraros assert the district court later refused, under the law of the case doctrine, to consider Dr. Robinson's and Dr. Olsen's remarks as showing pretext as to their retaliation claims. *See* Aplt. Opening Br. at 39 (citing Doc. 426, Aplt.App. Vol. V at 1568). But the cited order says nothing about the law of the case doctrine, and the court, in fact, declined to rule on the retaliation claim. *See* Aplt.App. Vol. V at 1568–69. The district court did discuss and apply the law of the case doctrine in a subsequent order, Doc. 498, when it assessed Dr. Bird's and Dr. Moraros's retaliation claims against Dr. Robinson and Dr. Olsen. *See id.* Vol. VII at 2558–60. But plaintiffs neither cite Doc. 498 on appeal nor challenge the district court's reasoning in that order. Plaintiffs accordingly have not shown the district court erred.

6. **NMSU's Reasons for Rescinding Dr. Bird's and Dr. Moraros's Admission to the School of Social Work Post–Nonrenewal Were Pretextual Because They Were Singled Out for an Audit of Their Credentials**

▇ Dr. Bird and Dr. Moraros argue that the district court erred by concluding

there was no factual issue as to whether the 2008 audit of their credentials conducted by then-Registrar Michael Zimmerman was part of a larger audit of all graduate students, and that NMSU's rescission of their admission to NMSU's School of Social Work after their teaching contracts were nonrenewed was therefore a pretext for race discrimination and retaliation. *See* Aplt. Opening Br. at 41–42.

The district court found it undisputed that NMSU audited all graduate admissions files for 2008, including those of Dr. Bird and Dr. Moraros, and letters regarding delinquencies in applications were sent to a number of admittees, including Dr. Bird and Dr. Moraros. Aplt.App. Vol. VII at 2567. Dr. Bird and Dr. Moraros argue on appeal they were singled out for audit rather than caught up in a larger audit of graduate credentials in 2008. Aplt. Opening Br. at 41–42. They include a single cite to Doc. 498, where the district court provided six pages of analysis of the parties' evidence concerning the 2008 audit of graduate admissions files. *Id.* at 42 (citing Aplt.App. Vol. VII at 2563–68). Although Dr. Bird and Dr. Moraros's single record cite is to all six pages, they do not explain what reasoning on those pages is in error.

The district court reviewed defendants' evidence showing that responsibility for graduate admissions had been given for the first time in a reorganization to the Office of University Admissions, which determined in 2008 that it was necessary to audit all of the graduate files, as that office had done a couple of years earlier for the undergraduate files. Aplt.App. Vol. VII at 2563, 2567. The court further pointed out that Dr. Bird and Dr. Moraros had presented no evidence that they were singled out for an audit. *Id.* at 2567.

Dr. Bird and Dr. Moraros do not mention or challenge any of the district court's reasoning; they merely acknowledge gen-

erally the court's conclusion that their credentials were checked as part of a larger audit. *See* Aplt. Opening Br. at 4142. They do not show they cited evidence to the district court that they were singled out for an audit of their credentials, nor do they present any such evidence on appeal. *See id.* Their argument is insufficient or waived due to their failure to develop it, *see Moore*, 195 F.3d at 1180 n. 17, and to explain how the court erred in its reasoning, *see, e.g., Reedy*, 660 F.3d at 1275; *Sports Racing Servs.*, 131 F.3d at 880. Plaintiffs have not shown the district court erred.

7. **NMSU's Reasons for Rescinding Dr. Bird's and Dr. Moraros's Admissions to the School of Social Work Post–Nonrenewal Were Pretextual Because They Had Already Provided Information to Support Admission**

■ Dr. Bird and Dr. Moraros argue the district court erred by concluding they could have provided more information about their credentials to NMSU during the 2008 audit than they did provide. Aplt. Opening Br. at 42. They assert they provided their medical school transcripts from "UACJ," a university in Juarez, Mexico, to NMSU when they were first admitted to NMSU in 2002, and "[t]hey provided the same information again when asked," so a jury could find that NMSU's rescission of their admission to the School of Social Work was a pretext for discrimination and retaliation. *Id.*

Dr. Bird and Dr. Moraros cite "Appx. V 1568," *id.*, which was probably intended to be a cite to Doc. 498, Aplt.App. Vol. VII at 2568. In that order, the district court pointed out that Dr. Bird's and Dr. Moraros's final medical school transcripts were not found in NMSU's files during the 2008 audit, that Dr. Bird and Dr. Moraros were asked to submit final transcripts, and that they refused to provide their transcripts again, even though final transcripts were required for admission to NMSU's graduate program. *Id.* at 2567–68. The court concluded Dr. Bird and Dr. Moraros had not shown that NMSU's reason for rescinding their admission to the School of Social Work was a pretext for discrimination. *Id.* at 2568.

Dr. Bird and Dr. Moraros do not mention or challenge the district court's reasoning, nor do they contest they were asked to provide copies of their medical school transcripts during the audit of their credentials. They cite the declarations they had submitted to the district court, *see* Aplt. Opening Br. at 42, but those declarations show that although they had provided medical school transcripts to NMSU in 2002, they provided only letters from UACJ in 2008, *see* Aplt.App. Vol. VI at 2116, ¶ 23 (Dr. Moraros's declaration); 2123, ¶ 23 (Dr. Bird's declaration). This contradicts plaintiffs' argument on appeal that they could not have provided more information about their credentials in 2008.

In short, plaintiffs were required to provide their transcripts in 2008, they point to no evidence they did so, and they accordingly have not shown error. Their argument is otherwise waived as unsupported, *see Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1169 (10th Cir.2002) (holding that an argument consisting entirely of conclusory statements and unhelpful citations was deemed waived for failure to brief); *Moore*, 195 F.3d at 1180 n. 17, and due to their failure to challenge the district court's reasoning, *see Reedy*, 660 F.3d at 1275; *Sports Racing Servs., Inc.*, 131 F.3d at 880. Plaintiffs have not shown the district court erred.

8. **NMSU's Reasons for Threatening to Revoke Dr. Bird's and Dr. Moraros's NMSU Graduate Degrees Were Pretextual**

■ The district court granted summary judgment to NMSU, Dr. Robinson,

and Dr. Olsen on Dr. Bird and Dr. Moraros's claim that these defendants threatened to revoke their NMSU graduate degrees on the ground that these alleged unrealized threats did not constitute an adverse employment action under the circumstances of this case. *See* Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment on Plaintiffs Bird and Moraros's Claims of Retaliation as a Result of a Memorandum Being Submitted With Allegedly False Allegations Against Plaintiffs and Alleged Threats to Revoke Degrees of February 14, 2014 ("Doc. 513"); Aplt.App. Vol. VIII at 2711–13. Although Doc. 513 is one of the orders plaintiffs have appealed, Dr. Bird and Dr. Moraros do not cite it anywhere in the argument section of their opening brief. Their argument here consists of a two-sentence paragraph with two case citations and no assertions of fact. Aplt. Opening Br. at 42. It does not address the district court's reasoning or explain why they think the district court erred. Their argument is plainly insufficient to show a triable issue on pretext and is otherwise waived as conclusory and unsupported, *Utahns for Better Transp.*, 305 F.3d at 1169; *Moore*, 195 F.3d at 1180 n. 17, and because they fail to challenge the district court's reasoning, *see Reedy*, 660 F.3d at 1275. Dr. Bird and Dr. Moraros have not shown the district court erred.

## 9. Dr. Robinson and Dr. Olsen Were Directly Involved In and Are Liable for the Nonrenewal of Dr. Bird's and Dr. Moraros's Teaching Contracts

Dr. Bird and Dr. Moraros argue generally they presented sufficient evidence that Dr. Robinson's and Dr. Olsen's actions against them were discriminatory and retaliatory. Aplt. Opening Br. at 43. They do not cite to the factual record or to any district court order in making this one-paragraph argument. They have not demonstrated any triable issue and their argument is otherwise waived due to inadequate development, *see Moore*, 195 F.3d at 1180 n. 17, and their failure to challenge the district court's reasoning, *see Reedy*, 660 F.3d at 1275. Plaintiffs have not shown the district court erred.

## 10. Dr. Robinson and Dr. Olsen Were Biased Against Dr. Bird and Dr. Moraros

Dr. Bird and Dr. Moraros assert their claims for race discrimination and retaliation against NMSU should be tried under *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), because Dr. Robinson and Dr. Olsen harbored racial and retaliatory animus toward them and proximately caused their nonrenewal, even though the Provost made the actual decision. Aplt. Opening Br. at 44–46; *see also id.* at 39–41. This is a "cat's paw" argument, although plaintiffs never use those words, "meaning that [they] sought to hold [their] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub*, 562 U.S. at 415, 131 S.Ct. 1186. This argument is similar to their fifth argument and fails for similar reasons.

The first paragraph of plaintiffs' argument contains their only cites to a district court order, which is Doc. 426. Plaintiffs assert that "[a]fter excluding the race-based comments of Robinson and Olsen as 'stray remarks,' the District Court found there was no evidence that either Robinson or Olsen were biased." Aplt. Opening Br. at 44 (citing Aplt.App. Vol. V at 1549–51, 1560–65). As we have already explained, however, in the cited order (Doc. 426), the district court addressed their claim only with respect to offensive remarks made by Dr. Robinson, and the court did not reject the allegations against

him as "stray remarks." *See* Aplt.App. Vol. V at 1561–63.

Plaintiffs do not challenge the district court's analysis of their cat's paw argument as to Dr. Robinson, so their argument is waived under *Reedy*, 660 F.3d at 1275. The court did not evaluate any evidence regarding Dr. Olsen in the cited order, *see* Aplt.App. Vol. V at 1563–65, and, as noted above, plaintiffs have not otherwise discussed any district court analysis of Dr. Olsen's remarks.

## 11. Dr. Robinson and Dr. Olsen Proximately Caused Dr. Bird's and Dr. Moraros's Nonrenewal, so NMSU Is Liable

As explained above, Dr. Bird and Dr. Moraros have not attempted to show the district court erred in rejecting their evidence that Dr. Robinson was biased against them, and Dr. Bird and Dr. Moraros have not cited to or discussed any district court analysis of Dr. Olsen's remarks. As a result, we need not consider their argument that such alleged bias was the proximate cause of their nonrenewal: the argument against Dr. Robinson lacks the necessary foundation, *see Moore*, 195 F.3d at 1180 n. 17, and the argument against Dr. Olsen does not challenge a district court order that addressed his inappropriate remarks, *see Reedy*, 660 F.3d at 1275.

## 12. Mr. Gallagher Is Liable for Retaliation Against Dr. Bird and Dr. Moraros Based on His Speech to the Press

▮ Finally, Dr. Bird and Dr. Moraros argue their claims for First Amendment retaliation against then-President of NMSU's Board of Regents Robert Gallagher should be tried, because there was sufficient evidence that he spread negative information about them because of their public speech on matters of public concern. Aplt. Opening Br. at 46–47.

The court granted summary judgment to Mr. Gallagher based on qualified immunity in the Memorandum Opinion and Order Granting Defendant Gallagher's Motion for Summary Judgment Based on Qualified Immunity of April 17, 2013 ("Doc. 481"), Aplt.App. Vol. V at 2442–48, which is not cited in the argument section of plaintiffs' opening brief. Applying the modified qualified immunity analysis to this First Amendment claim, the court said Mr. Gallagher had made his prima facie showing that his speaking to the press was objectively reasonable and that Dr. Bird and Dr. Moraros failed to carry their subsequent burden to show Mr. Gallagher's culpable state of mind. *Id.* at 2446–47. Plaintiffs do not argue on appeal that they did produce evidence of Mr. Gallagher's culpable state of mind, and they do not adequately present any now. Their appeal fails for insufficient argument and evidence or is waived due to inadequate development, *see Moore*, 195 F.3d at 1180 n. 17, and their failure to address the district court's reasoning, *see Reedy*, 660 F.3d at 1275. Plaintiffs have not shown the district court erred.

## B. *Mr. Cheteni*

Mr. Cheteni's arguments appear at pages 47–54 of the opening brief. The claims under review on appeal are interrelated and consist of Mr. Cheteni's claims against Mr. Zimmerman for First Amendment retaliation under 42 U.S.C. § 1983 and for retaliation for making discrimination claims under 42 U.S.C. §§ 1981 and 1983, and his claims against NMSU under Title VI, Title VII, and the New Mexico Human Rights Act (NMHRA). *See* Aplt. Opening Br. at 48, 52.

**13. Mr. Zimmerman's Actions Were Not Objectively Reasonable, so He Is Not Entitled to Qualified Immunity on Mr. Cheteni's Retaliation Claims**

■ One of Mr. Cheteni's claims against NMSU stems from Mr. Zimmerman's decision to charge him out-of-state tuition instead of in-state tuition for the Fall 2008 semester. Mr. Cheteni argues that Mr. Zimmerman was not entitled to qualified immunity on either his claim for retaliation based on race under § 1981 or his claim for retaliation based on speech protected by the First Amendment under § 1983. Aplt. Opening Br. at 52–54. Because Mr. Cheteni does not show that the district court erred in concluding Mr. Zimmerman did not violate § 1981 or § 1983, we affirm.

Mr. Zimmerman, the Registrar, granted Mr. Cheteni in-state tuition when he enrolled at NMSU in 2007 because of his 2006 application for asylum. Aplt.App. Vol. V at 1582. After Mr. Cheteni filled out an application in March 2008 for admission to a Ph.D. program in the College of Business listing his visa status as F–1 (foreign student), NMSU's Graduate Admissions Office (not the Registrar's Office) changed his tuition rate to out-of-state. *Id.* at 1583. When Mr. Cheteni inquired about the change, Mr. Zimmerman asked Mr. Cheteni to provide documentation that he was still on asylum status. *Id.* Mr. Zimmerman later asked Mr. Cheteni for a copy of his I–589 (the confirmation of receipt of his 2006 asylum application) based on an email dated July 31, 2008, from Mary Jaspers, the assistant director of the Office of Admissions, stating that Mr. Cheteni should be able to provide it. *Id.; see also id.* Vol. III at 885. Ms. Jaspers's email also informed Mr. Zimmerman that the code on Mr. Cheteni's work authorization card indicated that he had filed an application for asylum. *Id.* Vol. V. at 1583; *see also id.* Vol. III at 885. Her email did not say whether the code indicated it was still pending. *See id.* Vol. III at 885. Mr. Cheteni provided Mr. Zimmerman his I–589 and work authorization card for 2008–2009, but Mr. Zimmerman decided this documentation was insufficient to demonstrate that his 2006 asylum application was still pending and, therefore, that Mr. Cheteni should pay out-of-state tuition for the Fall 2008 semester.

The district court granted summary judgment to Mr. Zimmerman on the in-state tuition issue, based on qualified immunity, in its Memorandum Opinion and Order Granting Defendant Zimmerman's Revised Motion for Summary Judgment of November 20, 2012 ("Doc. 437"), using the modified qualified immunity analysis that applies when motive is an issue. *Id.* Vol. V at 1578–86. The court held that Mr. Zimmerman had "made a prima facie showing of the objective reasonableness of his conduct," but that Mr. Cheteni had "produced no specific evidence that Zimmerman was substantially motivated by a desire to discriminate or retaliate against Cheteni," and the court would "not comb the record" to look for such evidence. *Id.* at 1586. It thus concluded that Mr. Zimmerman had not violated § 1981 and § 1983.

Mr. Cheteni argues on appeal that Mr. Zimmerman's conduct was not objectively reasonable and his qualified immunity defense should have failed. Aplt. Opening Br. at 52–53. He provides one cite to three pages of the district court's order in Doc. 437. *Id.* at 52 (citing Aplt.App. Vol. V at 1584–86). The court, however, analyzed the relevant law and the parties' evidence in nine pages, *see* Aplt.App. Vol. V at 1578–86, which Mr. Cheteni does not address.

Mr. Cheteni argues that "Zimmerman wanted a new I–589, but none existed,"

and that "Zimmerman's insistence on a new I–589 created a Catch 22 for Cheteni, he could not comply." Aplt. Opening Br. at 53. He also asserts that Ms. Jaspers testified she did not tell Mr. Zimmerman that Mr. Cheteni could produce a new asylum application or a new form I–589. *Id.* These unsupported assertions do not address the district court's analysis, however. The district court pointed out that although Mr. Zimmerman expected a new asylum petition, he also made a general request for documentation showing that Mr. Cheteni's 2006 asylum application was still pending, yet "Cheteni did not submit any documentation that his asylum petition was still pending." Aplt.App. Vol. V at 1584. Mr. Cheteni does not show that the documentation he had already produced, i.e., his I–589 and work authorization card, established that his asylum application was still pending in 2008. The district court noted that Ms. Jaspers's email stated only that the code on his work authorization card showed that he had filed an asylum application, not that it was still pending. *See id.* at 1585; *see also id.* Vol. III at 885.

Mr. Cheteni also argues that Mr. Zimmerman believed that asylum applications were typically decided within two years and that Mr. Zimmerman did not produce evidence of the website upon which he allegedly relied for that information. Aplt. Opening Br. at 52–53. But Mr. Cheteni does not explain how Mr. Zimmerman's failure to prove the existence of the website upon which he relied shows that it was objectively unreasonable for him to believe that Mr. Cheteni should be able to provide some kind of documentation that his asylum application was still pending in 2008. Mr. Cheteni argues the facts he considers relevant to Mr. Zimmerman's "objective reasonableness" without reference to what the district court said about the evidence and without explaining how the court is supposed to have erred.

Mr. Cheteni also asserts that "Zimmerman's conduct was based on retaliatory animus" because he "demanded new documents within a month of Cheteni filing an EEOC charge and closely following numerous communications Cheteni had with the press regarding what he perceived to be discrimination and retaliation at NMSU." Aplt. Opening Br. at 53. Mr. Cheteni appears to argue on appeal that he produced sufficient evidence of Mr. Zimmerman's culpable state of mind to defeat his qualified immunity defense. But he offers no specific facts about these events, does not show that Mr. Zimmerman knew about his EEOC charge or his communications with the press, and fails to support his allegations with citations to the record. *See id.* And to the extent he asserts any facts, Mr. Cheteni provides no record cites to support them. *See* Aplt. Opening Br. at 53.

Mr. Cheteni's arguments are waived as conclusory, unsupported, and undeveloped, *see Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1169 (10th Cir.2002) (holding that an argument consisting entirely of conclusory statements and unhelpful citations was deemed waived for failure to brief); *Moore,* 195 F.3d at 1180 n. 17 ("We do not consider unsupported and undeveloped issues."), and because Mr. Cheteni fails to explain how the court's reasoning is in error, *see Reedy,* 660 F.3d at 1275; *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,* 131 F.3d 874, 880 (10th Cir.1997). Mr. Cheteni has not otherwise shown the district court erred in granting qualified immunity to Mr. Zimmerman on the ground that no § 1981 or § 1983 violation was shown. We turn to Mr. Cheteni's arguments against NMSU.

#### 14. NMSU's Reasons for Revoking Mr. Cheteni's In–State Tuition Were Pretextual Because He Sufficiently Demonstrated to Mr. Zimmerman His Asylum Application Was Still Pending

Mr. Cheteni argues NMSU is liable for race discrimination and retaliation on account of Mr. Zimmerman's decision to revoke his in-state tuition. Aplt. Opening Br. at 47, 50–52. He argues his tuition status was improperly reconsidered when "he listed his visa status on a university document as F–1 [foreign student]." *Id.* at 50. He further contends his 2006 asylum application and then-current work authorization card should have been sufficient documentation to demonstrate to Mr. Zimmerman that his asylum application was still pending and his in-state tuition should continue.

His brief cites only one page in Doc. 437, Aplt.App. Vol. V at 1582, and one page in the district court's Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment on Plaintiff Cheteni's Remaining Claims of July 2, 2013 ("Doc. 496"), Aplt.App. Vol. VII at 2551. The brief fails to address the district court's analysis of the revocation of Mr. Cheteni's in-state tuition, which covers seven pages in Doc. 437, Aplt.App. Vol. V at 1580–86 (on Mr. Zimmerman's motion for summary judgment), and two more in Doc. 496, Aplt.App. Vol. VII at 2550–51 (on NMSU's motion for summary judgment). Mr. Cheteni does not mention or challenge the district court's extensive analysis of the law and the evidence. *See Franklin Sav. Corp. v. United States,* 180 F.3d 1124, 1128 n. 6 (10th Cir.1999) (noting that broad, conclusory arguments may be waived on appeal).

Aside from the deficiencies of Mr. Cheteni's brief, we already have rejected his argument that Mr. Zimmerman should not have been granted qualified immunity for his decision to revoke Mr. Cheteni's in-state tuition. Because we uphold the district court's determination that Mr. Cheteni cannot prove the first prong of qualified immunity against Mr. Zimmerman— no § 1981 or § 1983 violation—NMSU cannot be found liable. *See Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 852 (10th Cir.2000) (stating that an employer's liability under Title VII is coextensive with an employee's liability under § 1981).

#### 15. NMSU Is Liable for Retaliation Because Mr. Zimmerman's Reasons for Reporting Mr. Cheteni's Loss of Student Status to Immigration Officials Violated a Prior Court Order

■ Mr. Cheteni argues in one paragraph that NMSU is liable for retaliating against him because Mr. Zimmerman reported his failure to maintain his F–1 student status to immigration officials after he was unable to enroll for the Spring 2009 semester. Aplt. Opening Br. at 51–52. He argues Mr. Zimmerman's report violated a prior court order in this case giving him until August 2009 to demonstrate he was eligible for in-state tuition because his asylum claim was still pending. *Id.* at 52.

Mr. Cheteni cites the district court's Order Adopting Magistrate Judge's Proposed Findings and Recommended Disposition (Doc. 51) of March 19, 2009 ("Doc. 66"), Aplt.App. Vol. I at 277, an early, one-page order adopting the magistrate judge's recommendation to deny Mr. Cheteni's motion for emergency injunctive relief. This order says nothing about enrollment or any substantive matter. The magistrate judge's Proposed Findings and Recommended Disposition of February 25, 2009 ("Doc. 51"), noted the parties' agreement to remove Mr. Cheteni's out-of-state tuition charges for the Fall 2008 semester and allow him to pay in-state tuition for

the Fall 2009 semester if he was able to obtain evidence by August 2009 showing that his asylum application was still pending in July 2008. *Id.* at 255. This four-page recommendation says nothing about Mr. Cheteni's lack of student status during the Spring 2009 semester or any agreement that NMSU would not report him as out of student status to immigration officials, *see id.* at 253–56, and Mr. Cheteni does not cite or discuss it on appeal, *see* Aplt. Opening Br. at 51–52.

Mr. Cheteni asserts that Mr. Zimmerman's actions in reporting him to immigration officials could be viewed as punishing him for protected activity, but he does not explain either the nature of the activity or why it is protected. *See id.* at 52. He may mean his "EEOC charge and ... [the] numerous communications [he] had with the press," *id.* at 53, but he offers neither specific facts about these activities nor record cites in support, *see id.*

The court decided Mr. Cheteni's reporting issue in Doc. 437, Aplt.App. Vol. V at 1579–80, 1587–89 (on Mr. Zimmerman's motion for summary judgment), and Doc. 496, Aplt.App. Vol. VII at 2550–51 (on NMSU's motion for summary judgment). Mr. Cheteni neither mentions nor challenges these orders or the district court's reasoning, so his "reporting" issue is waived. *See Reedy,* 660 F.3d at 1275. He has not shown the district court erred.

16. **NMSU's Reasons for Nonrenewal of Mr. Cheteni's Graduate Assistantship Were Pretextual Because Dr. Arnold Knew That He Was Enrolled in the Department of Health Sciences**

▆ Mr. Cheteni argues his claims for race discrimination and retaliation against NMSU should be tried because sufficient evidence showed the reason given by Stephen Arnold, then-Interim Head of the Department of Health Sciences, for not renewing his graduate assistantship in the summer of 2008 was pretextual. Aplt. Opening Br. at 47–50. As discussed above, the elements of the prima facie case for race discrimination and retaliation claims differ, but the *McDonnell Douglas* burden-shifting analysis is the same for retaliation claims related to race discrimination claims. Mr. Cheteni argues that Dr. Arnold knew, from Mr. Cheteni's email inquiring about his assistantship before the Fall 2008 semester began, that he was still enrolled in the Department of Health Sciences before assistantships were awarded. *Id.* at 48–49.

The district court concluded in Doc. 496 that graduate assistantships were reserved for majors in the College of Health and Social Services and that Mr. Cheteni was not enrolled in that college when Dr. Arnold checked applicants' registrations before awarding assistantships. Aplt.App. Vol. VII at 2541. Mr. Cheteni cites the district court's order, but he neither mentions nor challenges the court's analysis of the parties' evidence, and he does not cite any evidence showing when assistantships were awarded or that he was enrolled in the College of Health and Social Services before Dr. Arnold awarded assistantships. *See* Aplt. Opening Br. at 49. He asserts that he emailed Dr. Arnold on July 19, 2008, to inquire about his assistantship. *See id.* (citing Aplt.App. Vol. VII at 2429). Nevertheless, the pages he cites from Dr. Arnold's deposition show that Dr. Arnold had information in early July that he was a full-time student in the College of Business. *See* Aplt.App. Vol. VII at 2429 (Arnold depo. 122:21–124:22).

Mr. Cheteni does not provide a legal or factual basis to overcome the grant of summary judgment to NMSU on account of Dr. Arnold's actions. Also, because he does not confront the district court's analy-

sis, his challenge to the court's conclusion is waived. *See Reedy,* 660 F.3d at 1275; *Sports Racing Servs.,* 131 F.3d at 880. He has not shown the district court erred.

### 17. Mr. Cheteni's Claims Against NMSU Under Title VI, Title VII, and NMHRA Should Be Tried Because the District Court Applied the Wrong Legal Standard

■■■■ Mr. Cheteni argues, in one paragraph, that the district court erred in assessing his claims for race discrimination and retaliation against NMSU under 42 U.S.C. § 1981 because he asserted his claims against NMSU under Title VI, Title VII, and the New Mexico Human Rights Act (NMHRA). Aplt. Opening Br. at 47–48. His only cite to a district court order is to one page in Doc. 496, where the court discussed Mr. Cheteni's claim that NMSU is liable for Mr. Zimmerman's revocation of his in-state tuition and for reporting his lack of student status to immigration officials. *Id.* (citing Aplt.App. Vol. VII at 2551). We therefore limit our consideration to these claims.

The district court erred by assessing Mr. Cheteni's claim under § 1981 because Mr. Cheteni did not assert a § 1981 claim against NMSU,[9] but this error is harmless. Mr. Cheteni does not explain how analyzing his claim under Title VI, Title VII, or the NMHRA would be different from analyzing it under § 1981 to show that the district court should have reached a different conclusion. *See* Aplt. Opening Br. at 47–48. Accordingly, Mr. Cheteni does not

argue or show that he was prejudiced by the alleged error. *See id.*

We can affirm the court's conclusion that NMSU was entitled to summary judgment based on our having affirmed the district court's summary judgment in favor of Mr. Zimmerman regarding his decision to revoke Mr. Cheteni's in-state tuition and to report his lack of student status to immigration officials. "The issue of [NMSU's] liability under Title VII is coextensive with Mr. [Zimmerman's] liability under § 1981 ... [because these claims] are based on the same facts." *Heno,* 208 F.3d at 852. In addition, NMSU "may act only through natural persons as its agents or employees." *Id.* (internal quotation marks omitted). As a result, based on our previous conclusion that Mr. Cheteni has not shown the district court erred in holding that he had failed to establish that Mr. Zimmerman's conduct violated his rights under § 1981, NMSU cannot be found liable under Title VII based on the same conduct. *See Heno,* 208 F.3d at 852. A Title VI claim would also fail, because it uses Title VII's proof scheme. *See Bryant v. Indep. Sch. Dist. No. I-38,* 334 F.3d 928, 930 n. 1 (10th Cir.2003). And a NMHRA claim would fail as well because it uses the same standard as Title VII in a case, such as this one, alleging employment discrimination. *See Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 n. 5 (10th Cir.2005).

Even though the district court addressed Mr. Cheteni's claim against NMSU under § 1981, we may affirm its conclusion that NMSU is not liable for Mr.

---

**9.** Mr. Cheteni stated in the Stipulated List of Each Plaintiff's Claims Against Each Defendant of December 13, 2012 ("Doc. 443") that his remaining claims included "claims of race discrimination and retaliation pursuant to Title VI, Title VII, Section 1981 and NMHRA against NMSU." Doc. 443, at 3. This document is not included in the appendix, but the district court noted the stipulation in Doc.

443 when it stated in Doc. 496 that Mr. Cheteni's remaining claims against NMSU were brought under "Title VI, Title VII, Section 1981 and NMHRA." Aplt.App. Vol. VII at 2524–25. The fourth amended complaint, however, shows that Mr. Cheteni did not assert a § 1981 claim against NMSU. *See* Aplt. App. Vol. III at 786–92.

Zimmerman's decision to revoke Mr. Cheteni's in-state tuition on this alternate ground. *See Richison v. Ernest Grp., Inc.,* 634 F.3d 1123, 1130 (10th Cir.2011) (noting "we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal"). In short, NMSU is not liable for Mr. Zimmerman's revocation of his instate tuition.

## C. *Dr. Rao*

■ Dr. Rao raises the remaining "issue" on appeal, arguing generally that NMSU's reasons for failing to promote her to full professor in 2007 and 2009 were pretextual. Aplt. Opening Br. at 54–62. This general argument embodies four others: whether (a) Dr. Rao made out a prima facie case of discrimination in 2007, *id.* at 54–55; (b) Dr. Rao made out a prima facie case of discrimination in 2009, *id.* at 56–57; (c) Dr. Rao made out a prima facie case of retaliation in 2009, *id.* at 57–59; and (d) Dr. Rao presented sufficient evidence of pretext in her 2009 retaliation claim, *id.* at 59–62. As with plaintiffs' other arguments, however, Dr. Rao does not address the district court's reasons for granting summary judgment to NMSU or explain how the district court erred.

### 18. Dr. Rao Made a Prima Facie Showing of NMSU's Discrimination in 2007

Dr. Rao first argues the district court incorrectly held she did not establish a prima facie case of discrimination based on NMSU's failure to promote her to full professor in 2007. *Id.* at 54–55. She argued that she did not apply for promotion because it would have been futile without the approval of Dr. Robinson, the Chairman of the Department of Health Sciences, and he had told her that he would not support her. On appeal, she fails to support her argument's key factual assertions, *see Moore v. Gibson,* 195 F.3d 1152, 1180 n. 17 (10th Cir.1999), and does not challenge the district court's reasoning or explain how the court erred, *see Reedy,* 660 F.3d at 1275; *Sports Racing Servs.,* 131 F.3d at 880. In any event, we agree with the district court that Dr. Rao's prima facie case depended on producing evidence to support her statement that the lack of Dr. Robinson's recommendation would have doomed an application for promotion.

Dr. Rao contests the district court's determination in its Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment on Plaintiff Rao's Promotion Claim of April 25, 2013 ("Doc. 484"), that she had not demonstrated she would have been rejected for promotion to full professor for discriminatory reasons had she applied in 2007. *See* Aplt. Opening Br. at 55 (citing Aplt.App. Vol. VII at 2454–55). She had testified at her deposition that she needed Dr. Robinson's support and that he would not give it to her. *See id.* at 54–55 (citing Aplt.App. Vol. VI at 2004). The court acknowledged Dr. Rao had stated the importance of having Dr. Robinson's support, but pointed out she had produced no facts showing that her application for promotion would have been rejected without it. *See* Aplt.App. Vol. VII at 2454. Dr. Rao fails to recognize the court rejected her deposition as factual support on this point. *See* Aplt. Opening Br. at 55. Instead, she simply cites it again as her sole support for this argument on appeal. *See id.* Her failure to challenge the district court's reasoning and explain how the court erred is insufficient to show pretext. Her arguments otherwise are waived under *Reedy,* 660 F.3d at 1275; *Sports Racing Services,* 131 F.3d at 880; and *Hernandez v. Starbuck,* 69 F.3d 1089, 1093 (10th Cir.1995).

Dr. Rao also argues Dr. Robinson held her to a higher standard for promotion to full professor than other non-East Indian faculty members by requiring her to have a higher level of grant support. *See* Aplt. Opening Br. at 54–55. To support this assertion, she cites her deposition, where she stated summarily that she was required to have a "R01 grant" that was not in the promotion and tenure guidelines. *See* Aplt.App. Vol. VI at 2004 (Rao depo. at 292:3–292:19). She said nothing, however, about any other candidates for promotion or the requirements imposed upon them. *See id.* She cites the district court's decision in Doc. 484, Aplt.App. Vol. VII at 2457, but does not explain why the court's conclusion is wrong.

Dr. Rao further suggests that, in Doc. 484, the district court improperly rejected evidence that Dr. Robinson commented to her that "she was a 'smart Indian woman'" rather than construe the comment in her favor. Aplt. Opening Br. at 55 (citing Aplt.App. Vol. VII at 2454). The court rejected this comment as evidence of discrimination because she had produced no other facts to show it was discriminatory. Aplt.App. Vol. VII at 2454. Dr. Rao does not counter this conclusion with any facts or explanation. *See* Aplt. Opening Br. at 55. Dr. Rao has not shown the district court erred.

19. **Dr. Rao Made a Prima Facie Showing of NMSU's Discrimination in 2009**

Next, Dr. Rao argues the district court incorrectly held she did not establish her prima facie case showing NMSU discriminated against her when it failed to promote her to full professor in 2009. She argues the evidence showed she was qualified. Aplt. Opening Br. at 56–57.

Dr. Rao argues that, in Doc. 484, "[t]he District Court rejected Rao's claim to be qualified [for promotion], relying on the fact that the individuals in the promotion process were 11–1 against Rao's promotion; a process wherein decision makers were unable to identify any objective series of qualifications applied to Rao's dossier." *Id.* at 56 (citing Aplt.App. Vol. VII at 2455–58). The district court set out the requirements for Dr. Rao's prima facie case, relying for its legal framework on *Roebuck v. Drexel University*, 852 F.2d 715, 726 (3d Cir.1988), a case concerning tenure decisions. Aplt.App. Vol. VII at 2456. The court quoted *Roebuck's* holding that a candidate must show it was debatable that she was qualified for advancement to establish a prima facie case. *See id.* (quoting *Roebuck*, 852 F.2d at 726). It summarized Dr. Rao's evidence of the five-step formal promotion process for her 2009 application, pointing out that only one reviewer out of twelve recommended that she be promoted. *Id.* at 2456–57. The court concluded that given "the near unanimous vote against her promotion," she had not met the *Roebuck* standard. *Id.* at 2457.

Dr. Rao does not challenge the court's reasoning or its reliance on *Roebuck*, but refers instead to her need to prove her "objective" qualifications for the job. *See* Aplt. Opening Br. at 56 (citing *inter alia EEOC v. Horizon/CMS HealthCare Corp.*, 220 F.3d 1184, 1193 (10th Cir.2000)). But this reference to our case law on the prima facie case is made without any explanation or factual support and therefore does not show that the district court erred in its reasoning. She does not explain how she was objectively qualified for promotion when 11 out of 12 reviewers believed she was not qualified.

Dr. Rao also argues her qualifications were at least comparable to those of two non-East Indian faculty members who were promoted in 2000 and 2001, as well as

to Dr. Robinson's qualifications, who, she mistakenly asserts, was hired as a full professor in 2007. *Id.* at 57. The court rejected her arguments in Doc. 484, Aplt. App. Vol. VII at 2457–58, 2461–62, which Dr. Rao does not cite on appeal. The court explained that Dr. Rao had not produced evidence that the same or very similar standards for promotion applied to her as well as to Dr. Robinson—who was hired in 2007 as a department head, not promoted to full professor—and the two faculty members who were promoted to full professor in 2000 and 2001. *Id.* at 2457, 2462. The court noted Dr. Rao had not produced any evidence of a policy applicable to the hiring of department heads, and that the guidelines for her 2009 promotion application were issued in Fall 2001 and did not apply to the faculty members promoted in 2000 and 2001. *Id.* at 2457. The court added, in reliance on *Roebuck*, that comparators should be relatively near in time to the adverse action, but Dr. Rao's application for promotion was denied in 2010, almost a decade after the other two faculty members were promoted. *Id.* at 2457–2458.

Dr. Rao acknowledges and does not challenge the court's reliance on *Roebuck* for this point. *See* Aplt. Opening Br. at 57. Rather, she asserts that the two faculty members promoted in 2000 and 2001 were the most recent promotions in the department and "were subject to evaluation on the same factors as Rao and there was no evidence that they were subject to different standards." *Id.* In addition to lacking evidentiary support, this assertion reverses the burden of proof for a prima facie case. The argument is otherwise waived due to lack of support, *see Moore*, 195 F.3d at 1180 n. 17, and Dr. Rao's failure to challenge the district court's reasoning, *see Reedy*, 660 F.3d at 1275. Dr. Rao has not shown the district court erred.

### 20. Dr. Rao Made a Prima Facie Showing of NMSU's Retaliation in 2009

Dr. Rao also argues that the district court incorrectly held she did not establish her prima facie case that NMSU retaliated against her by failing to promote her to full professor in 2009. She argues that the evidence showed a causal connection between NMSU's adverse action and her protected activity. Aplt. Opening Br. at 5759.

The district court determined in Doc. 484 that Dr. Rao had satisfied the first two requirements of her prima facie case of retaliation: she had engaged in protected activity by filing EEOC charges of discrimination, complaining about discrimination, and speaking out against discrimination; and NMSU did not dispute that its failure to promote her was an adverse employment action. *See* Aplt.App. Vol. VII at 2451–52, 2458. But because she did not present evidence sufficient to establish a causal connection between her complaints and the denial of her promotion application, the district court found that she did not satisfy the third and final requirement of her prima facie case. *See id.* at 2458–60.

As to a causal connection between the adverse action and her protected activity, Dr. Rao asserts only that Dr. Arnold, then-Interim Head of the Department of Health Sciences, told her "that things would improve for [her] if she withdrew her complaints." Aplt. Opening Br. at 58. She concedes, however, that "Arnold was removed from the review process for Rao's promotion application." *Id.* (citing Aplt. App. Vol. VII at 2459).

Nonetheless, Dr. Rao asserts Dr. Arnold's statement "shows the state of mind of university administration toward Rao[,] and Arnold was still interim Department Head, with power to influence decisions

made in the department." *Id.* She further asserts that Dr. Robinson and Dr. Arnold "took a variety of adverse actions against Rao close in time to her protected activity that negatively affected her ability to secure promotion." *Id.* The problem with these assertions is that Dr. Rao fails to explain how Dr. Arnold speaks for the administration as a whole, fails to identify the adverse actions taken against her, and points to no factual support in the record, in any event. She therefore fails on appeal to show a causal connection between NMSU's adverse action and her protected activity.

The district court listed and addressed the four specific adverse actions Dr. Rao raised below, which concerned her appointment to or removal from university committees and her pay for teaching a summer course. *See* Aplt.App. Vol. VII at 2459–60. The court concluded in Doc. 484 that Dr. Rao's arguments did not concern the reasons the Executive Vice President gave for denying her a promotion—his expectation that she have more grant activity, more responsibility in the professional societies, and more publications. *See id.* at 2460. Dr. Rao does not mention or challenge this analysis. Her argument fails as conclusory and lacking in factual support, *see Moore,* 195 F.3d at 1180 n. 17, and is otherwise waived because she does not challenge the district court's reasoning, *see Reedy,* 660 F.3d at 1275. In any event, Dr. Rao has not shown the district court erred.

### 21. Dr. Rao Showed Pretext in her 2009 Retaliation Claim Against NMSU

Dr. Rao finally argues the evidence showed NMSU's proffered reasons for failing to promote her to full professor in 2009 were a pretext for retaliation. Aplt. Opening Br. at 59–62. But because she fails to show the district court erred in concluding she did not establish a prima facie case of retaliation, we need not consider her argument that she showed pretext at the final step of the *McDonnell Douglas* analysis.

## VI. CONCLUSION

Based on our extensive review of plaintiffs' briefs, the district court's orders, and the whole record on appeal, plaintiffs' arguments fail. *See Nixon v. City & Cty. of Denver,* 784 F.3d 1364, 1366 (10th Cir. 2015). Their selective presentation of the evidence ignores defendants' evidence and even some of their own evidence that the district court thought worked against them. Although plaintiffs have mentioned some of the conclusions the district court made, they generally have not addressed or challenged the court's extensive reasoning supporting its conclusions in the 14 orders they have appealed. In addition, many of plaintiffs' factual assertions are not supported by any cite to the record and others are not supported or are even contradicted by the cites given.

Plaintiffs' arguments are conclusory, unsupported, and undeveloped; do not challenge the district court's reasoning or explain how the district court erred; and/or were not raised in the district court. They are insufficient to overcome summary judgment or show the district court erred.

Affirmed.